Thomas A. WHITE, Plaintiff,

v.

JUDICIAL INQUIRY AND REVIEW
BOARD OF PENNSYLVANIA, et
al., Defendants.

Civ. A. No. 89–0576.

United States District Court,
E.D. Pennsylvania.

Aug. 8, 1990.

James E. Beasley, of Beasley, Casey, Colleran, Erbstein, Thistle & Kline, Philadelphia, Pa., for plaintiff.

Howland W. Abramson, Deputy Legal Counsel to the Court Adm'r of Pennsylvania, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

FARNAN, District Judge[1].

This case arises out of the attempt by the Roofers Union Local 30–30B of Philadelphia to give certain Philadelphia County judges clandestine gifts of money. As a result of an investigation into the activity of the Roofers Union, the plaintiff, Thomas A. White, was removed from his position as an elected judge of the Court of Common Pleas of Philadelphia County. Prior to his removal, Judge White received a hearing before the Judicial Inquiry and Review Board of Pennsylvania ("the Board"), which recommended his removal from the bench. Thereafter, the Pennsylvania Supreme Court reviewed the Board's recommendation and ordered Judge White's removal. Judge White has now filed this 42 U.S.C. § 1983 against the Board, the Pennsylvania Supreme Court and the individual members of those two organizations (collectively "the defendants") claiming:

> that defendants have repeatedly, intentionally and fragrantly violated the plaintiff's most fundamental federal constitutional right to due process in the proceedings and actions which they have directed against him. In so doing the defendants have unconstitutionally deprived the plaintiff of his liberty and property interests in his elected office, his profession, and his reputation and have deprived him of the right to take office after reelection for a second ten-year term to begin in January of 1988.

Complaint ¶ 9 (Docket Item ("D.I.") 1); *see also* Amended Complaint ¶ 10 (D.I. 13).

Instead of answering the Complaint, the defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) asserting that this Court lacks subject matter jurisdiction over the issues raised by Judge White's complaint. Judge White opposed the motion and subsequently filed an Amended Complaint and then later filed leave to file a Second Amended Complaint. The defendants have opposed both amendments. Thus, presently before the Court are 1) defendants' motion to dismiss and 2) plaintiff's motion to file an Amended Complaint and motion to file a Second Amended Complaint.

## I. BACKGROUND

Before turning to the facts of this case, an examination of the Pennsylvania ethics rules regulating state court judges is necessary. Article V, § 17(c) of the Pennsylvania Constitution provides that "[n]o justice, judge or justice of the peace shall be

---

1. Sitting by designation.

paid or accept for the performance of any judicial duty or any service connected with his office, any fee, emolument or perquisite other than the salary and expenses provided by law." Pa.Stat.Ann., Pa. Const. art. V, § 17(c) (Purdon 1969). Section 18 of the same Article creates the Board and provides that the Board has the responsibility to "keep informed as to matters relating to grounds for suspension, removal, discipline, or compulsory retirement of justices or judges." Pa.Stat.Ann., Pa. Const. art. V, § 18(e) (Purdon 1969).

The Board is made up of nine members: three judges of the Courts of Common Pleas from different judicial districts, two judges of the Pennsylvania Superior Court, two non-judge members of the bar of the Pennsylvania Supreme Court and two non-lawyers. Pa.Stat.Ann., Pa. Const. art. V, § 18(a) (Purdon 1969). In addition, the Board has a General Counsel, whose responsibility includes, *inter alia*, conducting investigations which eventually lead to hearings before the Board.

The Rules of Procedure Governing the Judicial Inquiry and Review Board ("Rules" or "R.P.Gov.J.I.R.B.") establishes the Board's specific powers and duties. One of the Rules grants the Board the authority to investigate allegations of judicial impropriety. It provides:

> The Board, of its own volition, or upon receiving a statement not obviously unfounded or frivolous, alleging facts indicating that a judge may be subject to suspension, removal, discipline, or compulsory retirement upon the grounds specified in Article V, section 17–18 of the Constitution of the Commonwealth of Pennsylvania, or for violations of the Canons of legal or judicial ethics or Standards of Conduct prescribed by the Supreme Court, shall make a preliminary investigation to determine whether formal proceedings should be instituted and a hearing held.

R.P.Gov.J.I.R.B. 1(a).

The Rules also grant the Board the emergency power to institute *ex parte* proceedings against a judge in certain circumstances:

> Incident to a preliminary investigation conducted pursuant to Rule 1 of these Rules or during a formal proceeding conducted pursuant to Rule 2 of these Rules, the General Counsel, with the concurrence of a reviewing member of the Board [as selected by the Board], may, upon their determination that the continued service of a judge is causing immediate and substantial public harm and an erosion of public confidence to the orderly administration of justice, which conduct appears to them to be a violation of the Code of Judicial Conduct or the Rules Governing Standards of Conduct of District Justices, petition the Supreme Court for injunctive or other appropriate interim relief, including temporary suspension or reassignment of the judge.

R.P.Gov.J.I.R.B. 24(a). The Rules further provide that, after investigation, the Board may institute formal proceedings whereby "the Board shall without delay issue a written notice to the judge advising him of the institution of formal proceedings to inquire into the charges against him." R.P.Gov.J. I.R.B. 2(a).

Accordingly, after an investigation, the Board may conduct an *ex parte* hearing and then hold a formal hearing at a later date. After either kind of hearing, the Board has the power to petition the Pennsylvania Supreme Court for action on the case. The Pennsylvania Constitution provides that upon a finding of "good cause", the Board shall recommend to the Pennsylvania Supreme Court the appropriate sanction for the violation which allegedly occurred, including "suspension, removal, discipline or compulsory retirement of the justice or judge." Pa.Stat.Ann., Pa. Const. art. V, § 18(g) (Purdon 1969). Article V requires the Pennsylvania Supreme Court to "review the record of the board's proceedings on the law and facts" and allows the Pennsylvania Supreme Court to "wholly reject the recommendation, as it finds just and proper." Pa.Stat.Ann., Pa. Const. art. V, § 18(h) (Purdon 1969). The state Supreme Court may, however, adopt the reasoning of the Board and order the recommended sanction.

In this case, the Board exercised the power to explore alleged judicial impropriety after it had learned of an inquiry by the Federal Bureau of Investigation ("FBI") into the conduct of certain Pennsylvania state court judges. Sometime during the mid-1980's, the FBI began an investigation of Stephen Traitz, the president of the Roofers Union Local 30-30B. The FBI learned of Traitz's plan to give cash to a number of judges in the Philadelphia area and, through electronic surveillance of telephone wires, the FBI knew that certain judges had made promises in return to Traitz. This investigation led the FBI to Judge White.

Judge White had entered the office as a judge of the Court of Common Pleas of Philadelphia County on January 2, 1978. In December 1985, Thomas Brown, casually known to Judge White as a long-time court employee, appeared in Judge White's chambers. Judge White, quite busy, informed Brown that he did not have much time but spoke for short time with Brown after Brown wished him a Merry Christmas. A phone call interrupted this short conversation between Judge White and Brown and Brown left Judge White's chambers but not before depositing an envelope on Judge White's desk.

Two or three days later, Judge White opened the envelope, believing it to be a Christmas card, but discovered $300 in the envelope. As his Complaint states, he had "an indefinite thought then that Brown may have been working for the Roofers Union. He did not, however, know how to contact Brown directly to return the gift and he did not actually know if the money had come from the Union." Complaint ¶ 24 (D.I. 1). It was not until Judge White subsequently attended a public luncheon conducted by the Roofers Union and had seen Brown at the luncheon that Judge White realized that his "indefinite thought" was correct, *i.e.*, that Brown worked with the Roofers Union. By the time of his attendance at this luncheon, however, Judge White had already directed his assistants to take the money and purchase gift certificates for his staff and other court personnel.

After learning of Brown's visit to Judge White, the FBI interviewed Judge White at his home on January 28, 1986. The FBI questioned Judge White about the Roofers Union scandal in general and asked him in particular if he had been handed any money by Brown. Judge White responded that he had not been "handed" cash and did not elaborate any further. Judge White, however, knew that Brown left the money "on his desk". After hearing Judge White's response, the FBI concluded its interview with Judge White and continued its investigation into the Roofers Union. Soon thereafter, the Grand Jury for the Eastern District of Pennsylvania ("Grand Jury") began its own inquiry and handed down several indictments against other judges involved in the scandal. Eventually, the Board sought to obtain the materials generated by the Grand Jury's investigation and the United States Attorney for the Eastern District of Pennsylvania complied with the request by providing the Board with a substantial amount of material.

The material received by the Board consisted of, *inter alia,* 600 hours of electronic surveillance. Judge White's voice, however, was not recorded on any of the electronic surveillance tapes. Soon after receiving the material, Robert L. Keuch, General Counsel for the Board, wrote Judge White:

This is to notify you, pursuant to Rule 1(b), that the Board has received allegations concerning your judicial conduct which have been determined to warrant further investigation. Also, pursuant to that Rule, you may provide an answer or other information relevant to these allegations.

\* \* \* \* \* \*

The inquiry into these allegations has been initiated by the Board itself. The allegations are that in 1984 and 1985 you accepted cash gifts from a representative of the Roofers Union, Local 30-30B, and that on your financial disclosure statement for the year 1984 you failed to list the cash gift.

Complaint, Exhibit B at 1-2 (D.I. 1).

Keuch's letter to Judge White asserted that Judge White's interaction with Brown

appeared to violate Pennsylvania's Code of Judicial Conduct, including Canon 1's prohibition against conduct by a judge which threatens the integrity and independence of the judiciary and Canon 2's rule against a judge's involvement in acts which "knowingly permit others to convey the impression that they are in a special position to influence him." Pennsylvania Code of Judicial Conduct, Canon 1 and 2 B. The letter also stated that it appeared as though a violation had occurred of Canon 5 C(1)'s command that "[a] judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality". Pennsylvania Code of Judicial Conduct, Canon 5 C(1).

The Board followed Keuch's letter with formal charges. Those charges stated that:

> Specifically, the Board charges that Respondent has violated Canons 1, 2, and 5C(1) of the Code of Judicial Conduct, ... in that:
>
> In the years 1984 and 1985, the Respondent accepted cash gifts from a representative of the Roofers Union, Local 30–30B, and
>
> That, despite the fact that the cash gifts referred to in the preceding paragraph were in amounts which would require reporting on Respondent's financial disclosure forms for the years 1984 and 1985, ... the
>
> Respondent failed to report the receipt of such a gift on his financial disclosure form for the year 1984.

Complaint, Exhibit C, Charges for Formal Proceedings at 1 (D.I. 1).

The Board eventually dropped the charges concerning the 1984 gift but pursued the other allegations, availing itself of Rule 24's *ex parte* proceeding when it filed with the Pennsylvania Supreme Court its Petition for Interim Relief. That document stated that:

> [T]he General Counsel and at least a majority of the Board have determined that the continued service of Respondent Thomas A. White as a Judge is causing immediate and substantial public harm and an erosion of public confidence to the orderly administration of justice as a result of conduct which, in the judgment of the Board and the General Counsel, violates the Code of Judicial Conduct.

Complaint, Exhibit E at 1 (D.I. 1). On January 30, 1987, the Pennsylvania Supreme Court, acting on the Board's recommendation, suspended Judge White from judicial office pending a formal hearing.

On March 11, 1987, a formal hearing was held before three of the nine members of the Board. By that time, the Board had amended its formal charges against Judge White to add the charge that Judge White had provided false information to the FBI when the FBI had interviewed him at his home. At the formal hearing, newspaper articles concerning the Roofers Union scandal, electric surveillance tapes and other evidence of Traitz's scheme were introduced. Judge White objected to the admission into evidence of some of these items, especially the electronic surveillance tapes. In arguing his point about the tapes, Judge White noted that there was no evidence that he was a party in such taped conversations. The three members of the Board conducting the hearing deferred evidentiary rulings until after the hearing had been completed.

On August 4, 1987 the Board issued its Final Report. The Final Report concluded that (1) Judge White had violated Canons 1, 2 and 5 C(1) of the Code of Judicial Conduct; (2) that he had failed to observe the high standards of conduct which are necessary to preserve the integrity of the judiciary and (3) that he had furnished false and misleading information to the FBI during his interview. In the Final Report, the Board admitted that it had reviewed some of the electronic surveillance. Nevertheless, given the other evidence, the Board recommended that Judge White be removed from office and be disqualified from any future judicial office.

On February 25, 1988, the Pennsylvania Supreme Court, in an opinion addressing eight consolidated cases of judges accused of impropriety as a result of the Roofers Union scandal, adopted the Board's recommendation. The state Supreme Court, in

rejecting various challenges made by Judge White to the Board's recommendation, wrote that:

> Judge White violated the Code by his receipt of the money, enabling Roofers Union officials to entertain the impression that they were in a special position to influence him. His conduct tainted the integrity of his office. *See* Canon 2(B). His subsequent disposition of the cash could only absolve him of this wrongdoing if it had the effect of undoing the harm done, in other words, disabusing the donor of any notion that it improperly influenced him. There was no effort to eradicate the impression reasonably created by his acceptance of the money.
>
> Respondent would also have us reject the Board's finding of misconduct with respect to his statements to FBI officials. Judge White responded negatively to the agent's question, "Did Tom Brown hand you an envelope...." He claims he did so because Brown placed the envelope on his desk and not in his hand. At the time, however, he knew that Brown had left cash in his chambers. Judge White describes his statement as a literally truthful response given in a stressful situation. Truthful perhaps, but still misleading. We have no doubt that Judge White understood or should have understood the import of the FBI inquiry. Thus he could have been completely candid only by responding that although Brown did not hand him the cash, respondent did receive the same and disposed of it in the matter outlined previously.

*In re Cunningham,* 517 Pa. 417, 538 A.2d 473, 487 (Pa.) (footnote omitted), *appeal dismissed sub nom. White v. Judicial Inquiry & Review Board,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988).

Judge White thereafter challenged the Pennsylvania Supreme Court's disposition of his case through an appeal to the United States Supreme Court but the appeal was dismissed for want of a substantial federal question. 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16. The plaintiff then filed this suit challenging the Pennsylvania Supreme Court's decision to remove him from office. In his Complaint, Judge White claims that "the Court's decision was itself inescapably tainted with procedural irregularities committed by the Board—including a pre-hearing judgment of guilt, indiscriminate *ex parte* exposure by the factfinder to prejudicial evidence, and the impermissible commingling of adjudicatory and prosecutorial functions in violation not only of the federal constitution but of the board's own rules." Complaint ¶ 59 (D.I. 1). Judge White claims that such conduct and his removal from office violated the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution.[2]

The defendants brought a motion to dismiss claiming that plaintiff's Complaint offends the *Rooker–Feldman* doctrine. The doctrine takes its name from *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), two cases interpreting 28 U.S.C. § 1257. Section 1257 provides that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the [United States] Supreme Court ...." 28 U.S.C.A. § 1257(a) (West 1966 & Supp. 1990).[3] As explained more fully below, the

---

**2.** Judge White makes another argument. He claims that his removal violates Article V, § 13 of the Pennsylvania Constitution by depriving the voters of Philadelphia of *their* constitutional rights. He claims that his reelection to office after the allegations concerning his alleged involvement in the Roofers Union scandal had been publicized creates in him a vested interest in a new term and thus his removal "ignored the principle of government by the people." Complaint ¶ 51 (D.I. 1). Judge White has apparently

dropped this allegation as it is not included in his Amended Complaint and therefore it will not be discussed by the Court.

**3.** At the time Judge White appealed the Pennsylvania Supreme Court's decision to the United States Supreme Court, § 1257 contained two routes for getting a challenge to a state supreme court decision to the United States Supreme Court. Depending on the nature of the challenge, a case had to go either the "appeal" route or the "writ of certiorari" route. In 1988, Con-

"*Rooker–Feldman* doctrine interprets 28 U.S.C. § 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court, for such authority is vested solely in [the United States Supreme] Court." *Asarco Inc. v. Kadish*, 490 U.S. 581, 109 S.Ct. 2037, 2048, 104 L.Ed.2d 696 (1989). Defendants argue that Judge White's Complaint seeks an improper review of the Pennsylvania Supreme Court's opinion and therefore requests this Court to grant their motion to dismiss.

Given the importance of the *Rooker–Feldman* doctrine to this case, the Court will examine the principles which animate the doctrine before resolving the motion to dismiss.

## II.  LEGAL ANALYSIS

### A.  *The Rooker–Feldman Doctrine*

■■■ With the growing use of § 1983, plaintiffs have frequently brought constitutional challenges to pending and completed state court proceedings. Federal courts have jurisdiction over challenges to *ongoing* state proceedings but must decline to exercise such jurisdiction in cases where the United States Supreme Court has indicated abstention is appropriate.[4] Federal courts, however, do *not* have jurisdiction over challenges to completed state court proceedings when the plaintiff seeks a review by the federal court of the decision of the state's highest court. As mentioned above, a complaint in federal court which seeks a reversal of a prior decision from a state's highest court between the same parties offends 28 U.S.C. § 1257 and the interpretation given that provision in *Rooker v.*

*Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

■■■ In *Rooker*, the petitioner brought suit in federal district court asserting that the Indiana Supreme Court's ruling in a case in which he was involved violated the due process and equal protection clauses of the Fourteenth Amendment. In construing the legislative predecessor to 28 U.S.C. § 1257, the court concluded that "[u]nder the legislation of Congress, no court of the United States other than [the Supreme] Court could entertain a proceeding to reverse or modify the judgment [of the Indiana Supreme Court].... To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original." 263 U.S. at 416, 44 S.Ct. at 150 (citations omitted). Accordingly, a plaintiff who seeks reversal of a state supreme court decision on federal constitutional grounds must seek such reversal in the Supreme Court of the United States.

Given the ruling in *Rooker*, a plaintiff in a § 1983 suit risks certain defeat if he unabashedly asserts that his federal suit seeks reversal of a prior state supreme court decision in which he was a party. Thus, a federal plaintiff who is mindful of § 1257 will attempt to avoid *Rooker*'s holding by asserting that his allegations resemble those held in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), to be outside the ambit of § 1257's strictures.

In *Feldman*, two applicants applied for admission to the Bar of the District of Columbia but both were denied. Both

gress amended § 1257 to require all challenges to the decision of a state's highest court to go the "certiorari" route.

**4.** For example, when a § 1983 suit challenges an ongoing proceeding in a state administrative agency, the federal court must decline to exercise its jurisdiction if that agency has specialized knowledge of state policy and the agency is charged with administering a complex regulatory system. *Burford v. Sun Oil Co.*, 319 U.S. 315, 333–334, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424 (1943). It is also appropriate for a federal court to abstain from exercising its jurisdiction in a

§ 1983 suit when a plaintiff seeks from the federal court an interpretation of state law when the ongoing state court proceeding can obviate the need to reach a federal constitutional question. *Railroad Comm. of Texas v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). In addition, abstention is appropriate where a plaintiff's § 1983 federal action raises claims which can be asserted as defenses in an ongoing state court proceeding when those defenses can fully vindicate plaintiff's rights. *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971).

brought § 1983 suits alleging various constitutional violations had occurred. Some of the allegations involved general challenges to procedural rules. Other allegations challenged the decision of the District of Columbia Court of Appeals not to waive certain bar requirements in considering the two plaintiffs' applications for admission. The Supreme Court, following the lead of its decision in *Rooker*, held that the district court lacked jurisdiction over the *specific challenges* to the decision of the District of Columbia Court of Appeals, the highest court of a state for purposes of § 1257. *See* 28 U.S.C. § 1257(b). The Supreme Court, however, held that subject matter jurisdiction existed over the *general challenges* to procedural rules.

The Court explained the distinction between the challenges to general rules and challenges to the application of given rules to the plaintiffs' cases:

> We have recognized that state supreme courts may act in a nonjudicial capacity in promulgating rules regulating the bar. Challenges to the constitutionality of state bar rules, therefore, do not necessary require a United States district court to review a final state-court judgment in a judicial proceeding. Instead, the district court may simply be asked to assess the validity of a rule promulgated in a nonjudicial proceeding. If this is the case, the district court is not reviewing a state-court judicial decision. In this regard, 28 U.S.C. § 1257 does not act as a bar to the district court's consideration of the case and because the proceedings giving rise to the rule are nonjudicial the policies prohibiting United States district court review of final state-court judgments are not implicated. United States district courts, therefore, have subject-matter jurisdiction over general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings, which do not require review of a final state-court judgment in a particular case. They do not have jurisdiction, however, over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was

unconstitutional. Review of those decisions may be had only in this Court.

*Feldman*, 460 U.S. at 485–86, 103 S.Ct. at 1316–17 (citations omitted).

Accordingly, challenges which require a federal court to review a "final state-court judgment in a particular case" violate § 1257's mandate. *Feldman*, 460 U.S. at 486, 103 S.Ct. at 1317. Federal courts do, however, have jurisdiction over "general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings". *Id.* Thus, a plaintiff, weary of § 1257, will assert that his § 1983 suit falls into the category of general challenges rather than into the category of challenges to the judgment in a particular case.

Not surprisingly, Judge White argues that his Complaint concerns only general challenges, a characterization which the defendants dispute. In resolving the motion to dismiss, the Court must thus determine whether Judge White's lawsuit constitutes a general or specific challenge. As the United States Court of Appeals for the Third Circuit has noted, there is "an occasional difficulty" in distinguishing between the two kinds of challenges. *Centifanti v. Nix*, 865 F.2d 1422, 1428 (3d Cir.1989). Therefore, the Court must, before turning to the merits of the motion to dismiss, explore the principles which help demark the line between the two categories of allegations.

### 1. General v. Specific Challenges

In determining whether allegations are general or a specific ones, "[t]he form of the [challenged] proceeding is not significant." *In re Summers*, 325 U.S. 561, 567, 65 S.Ct. 1307, 1311, 89 L.Ed. 1795 (1945). Rather, the focus should be on whether the plaintiff is challenging an act legislative in nature, such as a rule, or an act adjudicative in nature, such as the application of a given rule to the facts of his particular case. For example, challenges to rules promulgated to regulate lawyers are general challenges for two reasons. First, "[d]isciplinary rules are rules of general application and are statutory in character.

They act not on parties litigant but on all those who practice law...." *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980) (quoting from the vacated district court opinion in the same case, *Consumers Union v. American Bar Association*, 470 F.Supp. 1055, 1064 (E.D.Va. 1979) (Warriner, J., dissenting)). Second, the challenge is not to a particular decision by a given court but rather to the "alleged constitutional defects in the procedural rules". *Centifanti*, 865 F.2d at 1430.

In contrast, the decision in a specific case arises from a judicial inquiry.

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*Prentis v. Atlantic Coast Line*, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). Normally, a judicial inquiry adjudicates rights through factfinding. "[T]he determination as to ... rights turns almost wholly upon the facts to be found.... When those are settled the law is tolerably plain.... All ... constitutional rights ... depend upon what the facts are found it be." *Id.* at 228, 29 S.Ct. at 70.

Consequently, if there is a federal challenge implicating the findings of fact in state court and the state court decision which arose from the findings of fact, then the challenge is likely a specific one. As the Third Circuit has stated, "excessive factual detail" in a complaint is a "factor" in determining whether the complaint will be viewed "as an attempt at improper review of the state court decision." *Centifanti*, 865 F.2d at 1431 n. 11. Extensive exposition of specific facts is unnecessary if the district court is only being asked to review a rule's general applicability and thus extensive factual detail in the complaint will provide indicia of whether the plaintiff's challenge is "completely focused on his own case." *Stern v. Nix*, 840 F.2d 208, 213

(3d Cir.), *cert. denied*, 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988).

■ This Court, therefore, must determine whether Judge White's allegations challenge actions which arose from a judicial inquiry and which, through factfinding, "disposed of ... litigation between the parties" or whether Judge White seeks a ruling on the constitutionality of legislative actions such as those rules which "regulate the profession by applying ... orders to all present members of the Bar and to all persons within the described class in the future." *Lathrop v. Donohue*, 367 U.S. 820, 827, 81 S.Ct. 1826, 1829, 6 L.Ed.2d 1191 (1961) (plurality opinion). In making a decision on the nature of Judge White's allegations, the Court is mindful that a plaintiff may not avoid the *Rooker–Feldman* doctrine by merely claiming that the act challenged in his complaint is legislative rather than judicial. Rather, the plaintiff must show that the allegations in his federal case are not related to the issues ruled upon by the state court in its judicial inquiry.

In elaborating on how distinct from the state-court ruling a plaintiff's federal challenge must be, the Supreme Court stated in *Feldman:*

If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application ..., then the district court is in essence being called upon to review the state-court decision.

*Feldman*, 460 U.S. at 483–484 n. 16, 103 S.Ct. at 1315–16 n. 16. Justice Marshall has recently defined the meaning of "inextricably intertwined":

[I]t is apparent, as a first step, that the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, any other than a

prohibited appeal of the state-court judgment.

*Pennzoil v. Texaco, Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 1533, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring). Accordingly, the Court will now turn to the merits of the defendants' motion to dismiss and determine whether Judge White's allegations are separate from the issues upon which the Pennsylvania Supreme Court ruled or are "predicated upon a conviction that the state court was wrong". *Id.*

### B. *Motion to Dismiss and Motion to File an Amended Complaint*

█ The defendants' motion to dismiss, filed pursuant to Fed.R.Civ.P. 12(b)(1), asserts that this Court lacks subject matter jurisdiction over the allegations of Judge White's Complaint. In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(1), this Court must use the standard for dismissals developed under Fed.R.Civ.P. 12(b)(6). *Pinewood Estates v. Barnegat Township Leveling Board*, 898 F.2d 347, 349–50 n. 4 (3d Cir.1990). Consequently, the Court must "accept as true the facts alleged in the complaint and all reasonable inferences drawn from them. Dismissal ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). The Court thus must accept plaintiff's allegations as true and determine whether the allegations raise a general challenge to a rule or whether they seek an impermissible review of the specific facts of a case already ruled upon by the Pennsylvania Supreme Court.

In his brief in opposition to defendants' motion, plaintiff raises various claims concerning what he asserts to be the general challenges made in his Complaint. Those claims can be reduced to two sets of arguments. First, he relies on the similarity of his claims to those asserted in *Centifanti v. Nix*, 865 F.2d 1422 (3d Cir.1989). In *Centifanti*, the Third Circuit Court of Appeals, following the United States Supreme Court's decision in *Feldman*, held that 28 U.S.C. § 1257 does not bar general challenges in federal court to state rules regulating lawyers. Second, he asserts that he seeks only declaratory relief, not injunctive relief. Accordingly, he argues that he does not seek a ruling which would require an impermissible review of the state court judgment. He asserts that he only seeks a declaration that his rights were violated by the procedures employed by the Board and the Pennsylvania Supreme Court.

█ After he filed his brief, plaintiff sought to amend his Complaint to bring it more in line with the arguments raised in the brief. For example, the Amended Complaint deleted much of the factual detail of the Complaint, reducing the original thirty-page Complaint to eight pages. Much of the deleted material referred to the specific facts of Judge White's case, an indication that the Complaint challenged not general rules but the specific facts of his case. *Stern*, 840 F.2d at 212–13. As a consequence of this, defendants have opposed Judge White's amendments.

The Fed.R.Civ.P. 15(a), however, provides that: "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served...." A motion to dismiss is not a responsive pleading. *Centifanti*, 865 F.2d at 1431 n. 9. Therefore, the Court will allow the amendments to the Complaint and consider defendants' motion to dismiss as directed to plaintiff's Amended Complaint. Despite the changes in the Amended Complaint, the arguments made by both the plaintiff and defendants in their briefs remain equally valid.

The Court will thus first examine the similarity of Judge White's allegations in the Amended Complaint to those raised in *Centifanti*. Thereafter, the Court will consider Judge White's second argument concerning declaratory relief.

#### 1. Case Law

█ In *Centifanti*, the Supreme Court of Pennsylvania had suspended the plaintiff attorney, Centifanti, from the practice of law because of his plea of *nolo contendere* to charges of aggravated assault on his wife. Three years after his suspension, Centifanti filed a petition for reinstate-

ment. The Disciplinary Board of the Pennsylvania Supreme Court ("Disciplinary Board") placed the matter before a hearing committee. The hearing committee, after holding proceedings, submitted a report to the Disciplinary Board urging that the petition be granted. After further hearings, the Disciplinary Board recommended to the state supreme court by a 8–to–1 vote that Centifanti be reinstated.

After the Disciplinary Board's recommendation, Centifanti filed an application for leave to file with the Pennsylvania Supreme Court a brief in support of his reinstatement. The state Supreme Court, without a written opinion, summarily denied Centifanti's request to file a brief as well as his request for reinstatement. Centifanti thereafter filed a 42 U.S.C. § 1983 suit in federal court seeking injunctive relief and alleging four constitutional violations of equal protection and due process. Those allegations were:

> 1) that the bar rules failed to provide for a hearing before the Justices of the Pennsylvania Supreme Court prior to action on a petition for reinstatement, following favorable action on the petition by the hearing committee and the Disciplinary Board;
>
> 2) that the rules failed to allow petitioners to submit briefs to the Justices in support of the recommendation of the Disciplinary Board that a petitioner be reinstated, or to address any concerns or comments expressed by the Board;
>
> 3) that the rules failed to provide notification to petitioners, following favorable action by the Board, that the Justices may believe that reinstatement may not be in order, and fail to allow petitioners a hearing before the Justices and to submit a brief addressing any concerns the Justices may have; and
>
> 4) that the rules failed to require issuance of a statement of reasons when the Justices reject a petition for reinstatement which had been favorably acted upon by the Board.

*Centifanti,* 865 F.2d at 1426.

The Third Circuit reversed a district court's holding that the *Rooker–Feldman*

doctrine barred jurisdiction over these claims. The appellate court reasoned that jurisdiction existed because "[h]ere Centifanti challenges the constitutionality of the Pennsylvania rules *as they exist,* rather than the state court's *application of them* to deny his petition." *Id.* at 1429 (emphasis added). It further observed that Centifanti's request for an injunction sought only *prospective* relief. "Although such relief, if granted, could affect *future* decisions of the state supreme court, it would not require review of a past decision." *Id.* at 1430 (emphasis in original). The Third Circuit thus concluded that "the district court could hold the state rules in question violate the Constitution, without holding that the Pennsylvania Supreme Court erred in denying Centifanti's petition for reinstatement." *Id.*

In *Centifanti,* the Third Circuit distinguished its decision from that court's decision in *Stern v. Nix,* 840 F.2d 208 (3d Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988). In *Stern,* the plaintiff Stern, an attorney who had been suspended by the Pennsylvania Supreme Court, sued under § 1983 seeking a stay of the state Supreme Court's decision. The § 1983 suit raised a challenge to two state court rules: "(1) the court-made rule that review of attorney discipline hearings by the Supreme Court of Pennsylvania is *de novo* and that during such review the Supreme Court is not bound by the findings of either the Hearing Committee or the Disciplinary Board, . . .; and (2) the Pennsylvania Rule of Disciplinary Enforcement that provides attorneys facing disciplinary charges with the right to oral argument before the Supreme Court of Pennsylvania, . . . but makes no provision for an evidentiary hearing before the Supreme Court." *Stern,* 840 F.2d at 212 (citations omitted). Stern thus challenged the "rule or practice" which allowed the Supreme Court to reject the findings of the hearing committee and Disciplinary Board "without affording the attorney an evidentiary hearing before it." *Id.*

In his complaint Stern requested a declaratory judgment and a preliminary in-

junction. *Id.* The Third Circuit upheld the district court's conclusion that the *Rooker–Feldman* doctrine barred such relief. Noting that the plaintiff's complaint was a "skillful attempt to mask the true purpose of the action," *Stern* reasoned that plaintiff's request for relief "required him to demonstrate the likelihood of success on the merits and irreparable harm *to himself,* thus shifting the focus to the actions of the Supreme Court of Pennsylvania in his particular case." *Id.* at 212 (emphasis in original). When his claims were reduced to their most basic formulation, Stern was asserting that "in disbarring *him,* the Supreme Court, pursuant to its rules and procedures, rejected the Hearing Committee's findings and as a result 'the Supreme Court violated *Stern's* right to due process of law.'" *Id.* at 213 (emphasis in original) (quoting from Stern's appellate briefs). The Court thus concluded that "despite his attempt to draft his complaint in the form of a general challenge to a state court rule, he in reality is seeking a review of a state court judgment in his particular case." *Id.* at 213.

Judge White's allegations bear a greater resemblance to the assertions in *Stern* rather than to those in *Centifanti.* Judge White's Amended Complaint addresses only the facts of *his* case. For example, in describing the alleged unconstitutionality of the Board's *ex parte* proceeding concerning the plaintiff, Judge White challenges, as did Stern, the process employed by the defendants in his particular case. The Amended Complaint alleges that the *Board's petition to the Pennsylvania Supreme Court* for a suspension of the plaintiff was "a gross rape of the federal constitution" and "a blind rush to justice". Amended Complaint ¶ 9 (D.I. 13). Instead of challenging a rule of general applicability, the Amended Complaint alleges that the "defendants repeatedly, intentionally and flagrantly violated *the plaintiff's* most fundamental federal constitutional *right to due process* in the proceedings and the *actions* which they directed against *him.*" Amended Complaint ¶ 10 (D.I. 13) (emphasis added). *Compare Stern,* 840 F.2d at 213 (plaintiff's allegation of violation of

"*Stern's* right to due process" held to be indicia of specific challenge) (emphasis in original).

The "actions" upon which the Amended Complaint focuses do not concern general rules applied to all members of a class but rather Judge White's treatment by the defendants: "members of the board, as shown by the procedures they followed, were biased against *him* and finally irretrievably prejudged *him* on prejudicial evidence without affording *him* any prior hearing." Amended Complaint ¶ 12 (emphasis added). In fact, in defining which procedures show the alleged prejudice, the Amended Complaint lists eight instances of unconstitutional conduct, none of which represent a challenge to a rule of general applicability.

Those eight allegations are that the Board violated plaintiff's rights by:

(1) unnecessarily and deliberately exposing all members of the Board to highly prejudicial prehearing evidence, without selectivity, before any hearing took place;

(2) disregarding both Rule 24(a) and Rule 1(c), Rules of Procedure Governing the Judicial Inquiry Review Board, which provide for an "investigatory committee [which] shall consist of two members of the Board who shall not thereafter sit as a hearing committee,"[;]

(3) deliberately exposing every member of the factfinding tribunal indiscriminately to inadmissible and prejudicial raw investigative evidence developed with respect to the entire Roofers Union matter and other judges who are in different factual settings and for whom the plaintiff is not answerable, and then flagrantly citing prejudicial evidence as the very reason for their decision;

(4) allowing the General Counsel who serves as prosecutor, chief investigator, legal advisor, and Executive Director of the Board to participate in the deliberations of the *en banc* Board, while denying the plaintiff any presence or representation at any time before a final decision on misconduct was pronounced and

up until the prospective hearing date of April 9, 1987;

(5) filing and pursuing charges motivated solely by press editorials and newspaper articles;

(6) depriving plaintiff of a fair and reasonable opportunity to prepare an adequate defense before the Board by failing to provide the specific fact basis for any of the alleged charges;

(7) intentionally depriving plaintiff of even the semblance of a fair hearing by privately adopting an agreement allowing the hearing panel to hear the prejudicial hearsay evidence that it previously relied upon to suspend plaintiff without a hearing;

(8) requiring panels to hear all the objected to inadmissable prejudicial hearsay evidence and reserving final ruling on the admissability until the entire Board met later in closed session, thus preventing plaintiff from having any rules of evidence applied at his hearing and preventing him from addressing evidentiary questions which would influence a decision in his case.

Amended Complaint ¶ 15(1) through (8) (D.I. 13).

Each of the eight challenges focuses upon actions taken by the Board, and later approved by the Pennsylvania Supreme Court, which concern plaintiff only. That the Board may have treated another judge similarly does not mean that the Board has adopted a general rule to employ the procedures used in Judge White's case in all other cases nor does it "change the fact that [Judge White] is essentially seeking a reversal of his own judgment." *Stern*, 840 F.2d at 212. As in the plaintiff's case in *Stern*, Judge White's allegations require him to show "harm to *himself*, thus shifting the focus to the actions of the Supreme Court of Pennsylvania in his particular case." *Id.*

Consequently, the Court concludes that Judge White's allegations in this case bear no resemblance to the challenges raised in *Centifanti*. In this case, unlike in *Centifanti*, the plaintiff does not challenge a rule which can be held to be unconstitutional on its face.[5] In fact, the only rule discussed in the Amended Complaint at any length, Rule 24, is not challenged as unconstitutional on its face. Rather, the Amended Complaint alleges that Rule 24 was *improperly applied to him* because the Board ignored the mandate that the members of the committee investigating the charges against a judge shall not thereafter sit as a hearing committee. *See* R.P. Gov.J.I.R.B. 1(c); Amended Complaint ¶ 15(2).

Furthermore, plaintiff's brief in opposition to defendants' motion to dismiss, after discussing the Rules of Procedure Governing the Judicial Inquiry and Review Board, concedes that "[n]o challenge to these rules is raised in the present proceedings." Amended Memorandum in Opposition to Motion to Dismiss at 9 (D.I. 12). Thus, the Court concludes that plaintiff's Amended

---

**5.** Two other cases upon which Judge White relies are inapplicable to his case because both cases concern general challenges to state bar rules. In *Razatos v. Colorado Supreme Court*, 746 F.2d 1429 (10th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), a suspended attorney sued the Colorado Supreme Court seeking a declaratory judgment that Rule 252 of the Colorado Rules of Civil Procedure violated due process. The appellate court, applying the *Rooker–Feldman* doctrine, concluded that "[i]n order to evaluate this claim, the district court need not review the decision of the Colorado Supreme Court. It need only look at Rule 252 as promulgated, and as construed by state case law." *Razatos*, 746 F.2d at 1434. Accordingly, the appellate court reversed the district court's holding that it lacked jurisdiction because the district court would not have to look at the facts of Razatos's particular case, but rather only examine on its face Rule 252.

Similarly, in *Gershenfeld v. Justices of the Supreme Court of Pennsylvania*, 641 F.Supp. 1419 (E.D.Pa.1986), a suspended attorney filed suit seeking declaratory and injunctive relief on the ground that Pennsylvania Rule of Disciplinary Enforcement 208(f) was unconstitutional. The Court, without discussing the *Rooker–Feldman* doctrine, concluded that "Rule 208(f) is unconstitutional on its face." *Gershenfeld*, 641 F.Supp. at 1425. Accordingly, the challenges in *Gershenfeld* and *Razatos*, unlike in Judge White's case, relate solely to rules and therefore those challenges could be adjudicated without reference to the facts of a particular case.

Complaint focuses only upon the facts of his given case and, therefore, does not differ in any significant respect from the complaint dismissed in *Stern*.[6] Nevertheless, despite the factual specificity of his complaint, Judge White argues that his request for declaratory relief erases any deficiency in his Amended Complaint. The Court, therefore, must determine the importance of the declaratory relief before deciding to dismiss plaintiff's Complaint.

### 2. Declaratory Relief

██ Judge White asserts that his request for only a declaratory judgment obviates any jurisdictional hurdle created by the *Rooker–Feldman* doctrine. In support of this assertion, he relies on a footnote in *Stern* which states that the Third Circuit would not follow the Tenth Circuit's decision in *Razatos v. Colorado Supreme Court*, 746 F.2d 1429 (10th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), because unlike the plaintiff in *Stern*, "[i]n *Razatos*, the plaintiff requested only declaratory relief and a hearing, not an injunction, 746 F.2d at 1430, and, in contrast to Stern, maintained the general nature of his challenge throughout the proceedings." *Stern*, 840 F.2d at 212 n. 2. Here, Judge White has not maintained the general nature of his challenge. In addition, the mere request for a declaratory judgment does not define how this Court will view Judge White's Amended Complaint because "the substance and not the form of the requested relief is ultimately controlling." *Centifanti*, 865 F.2d at 1429 n. 8.

In this case, the substance of the Amended Complaint reveals that Judge White seeks to use a ruling from this Court as an injunction. As the Amended Complaint states:

> [T]he Disciplinary Board of the Supreme Court of Pennsylvania (an arm of the defendant Court) instituted new proceedings against the plaintiff on February 7, 1989 in which it avers that plaintiff may be deprived of his right to practice law as a result of the *findings and conclusions of the defendants Board and Supreme Court* in a judicial disciplinary matter.

> As set forth above, those findings and conclusions were obtained through the use of prejudicial evidence and unconstitutional proceedings and are necessarily tainted.

> *Unless this Court issues a declaration that the proceedings undertaken by the defendants Board and Court constituted unconstitutional infractions of plaintiff's civil rights*, the Disciplinary Board will attempt to use the findings and conclusions of those tainted proceedings against plaintiff, jeopardizing or causing him to be unconstitutionally deprived of his rightful license to practice law.

Amended Complaint ¶ 17 (D.I. 13) (emphasis added). Accordingly, the plaintiff seeks to use a declaration in an offensive manner to prevent an ongoing state proceeding.[7]

---

**6.** Judge White's reliance on *Fink v. Supreme Court of Pennsylvania*, 651 F.Supp. 1238 (M.D. Pa.1987), and its interpretation of the *Rooker–Feldman* doctrine is misplaced. In *Fink*, a state judge, Judge Fink, and his supporters brought an action seeking injunctive relief against the Pennsylvania Supreme Court and its members because of Judge Fink's reassignment to administrative and non-decisional duties. The plaintiffs in *Fink* contended that "Judge Fink was not afforded his due process rights specifically because the Board and Supreme Court did not comply with the provisions of the Pennsylvania Constitution of 1968 and the Rules promulgated thereunder." *Fink*, 651 F.Supp. at 1244. In the court's limited discussion of the *Rooker–Feldman* doctrine, it concluded that the *Rooker–Feldman* doctrine was not applicable to Judge Fink's case. The court concluded that it had jurisdiction over Judge Fink's challenge be-

cause "[n]o rule is being attacked here." *Fink*, 651 F.Supp. at 1244. Under the interpretation of the *Rooker–Feldman* doctrine found in *Stern* and *Centifanti*, both decided after *Fink*, a prerequisite to finding jurisdiction is a challenge to a rule rather than a challenge to the facts of plaintiff's particular case. This Court thus concludes that a challenge to a general rule is required in order to avoid the *Rooker–Feldman* doctrine. *See Ross v. Zavarella*, 732 F.Supp. 1306, 1314–15 (M.D.Pa.1990) (relying on the *Rooker–Feldman* doctrine, court concludes that plaintiff state court judge cannot challenge her transfer to different duties).

**7.** Judge White's attempt to use a § 1983 action to stop an action related to his fitness to practice law arguably violates the abstention doctrine as stated in *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971). *See*

Furthermore, in order to grant Judge White the relief he seeks, the Court must determine that the "findings and conclusions" in his particular case were tainted. In order to reach that conclusion, the Court would have to review the state Supreme Court's decision to approve the Board's recommendation of removal from judicial office. As the Amended Complaint states, the Pennsylvania Supreme Court's decision is inescapably tied to the unconstitutional procedures followed by the Board:

> The plaintiff further avers that the members of the Supreme Court were aware of, approved, enforced, ratified and joined in the constitutionally offensive conduct of the Board and its General Counsel ... and, despite a state constitutional requirement of confidentiality, also caused the plaintiff prejudice and infringed his constitutionally protected interests by making a public prehearing order of suspension.

Amended Complaint ¶ 14 (D.I. 13).

▬ The Pennsylvania Supreme Court, however, has already reviewed the allegedly "constitutionally offensive conduct of the Board and its General Counsel", Amended Complaint ¶ 14, and approved it. *Cunningham*, 538 A.2d at 486–87. In fact, the Pennsylvania Supreme Court has already ruled upon some of the challenges raised by Judge White in this Court. *Compare Cunningham*, 538 A.2d at 483 (ruling upon the alleged unconstitutionality of commingling of investigative, adjudicative and prosecutorial functions of Board and General Counsel), 483 n. 19 (ruling upon the alleged improper composition of the Board's investigatory committee) *with* Amended Complaint ¶ 15(4) (raising commingling issue) and Amended Complaint ¶ 15(2) (raising investigatory committee issue). An examination of the alleged unconstitutional procedures of the Board would thus lead to an impermissible review of the Pennsylvania Supreme Court's decision to approve those procedures and adopt the Board's recommendation of removal.[8]

The Court therefore concludes that Judge White's Amended Complaint is inextricably intertwined with the merits of the Pennsylvania Supreme Court's decision because "the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 1533, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring). Accordingly, the Court concludes that, despite the request for declaratory relief, it lacks subject matter jurisdiction over the plaintiff's Amended Complaint and that as a result the defendants' motion to dismiss must be granted.

### C. *Motion to File a Second Amended Complaint*

▬ Judge White has filed a motion seeking leave to file a Second Amended Complaint. His proposed complaint does not alter the allegations of the Amended Complaint. Instead, it adds new allegations based upon an order issued by the State Employees' Retirement Board on July 20, 1988 ("Order"), well before the inception of this lawsuit. The Order, after recounting that the Pennsylvania Supreme Court had removed Judge White from office, stated that, *inter alia*, Judge White's election of a certain retirement allowance was denied. The new allegations in the

---

*Middlesex Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). There is, however, no need to address *Younger* abstention because the Court has found that Judge White's Amended Complaint offends the *Rooker–Feldman* doctrine.

**8.** It is irrelevant to the analysis of the issues presented by the motion to dismiss in this case whether Judge White actually raised every issue before the Pennsylvania Supreme Court which he now raises in this Court. Judge White clearly had the opportunity to argue the constitutional issues presently alleged in his Amended Complaint. A federal district court does not serve as an auxiliary state supreme court to hear belated arguments not raised to that state court or to hear those arguments rejected without written opinion by a state supreme court. *See Stern*, 840 F.2d at 213 n. 13 (the failure to raise claims when given the opportunity "means only that the plaintiff may have waived his right to raise those claims in any federal court") (relying upon *Feldman*, 460 U.S. at 482 n. 16, 103 S.Ct. at 1315–16 n. 16).

proposed Second Amended Complaint challenge the Order:

> [A]s a result of the July 20, 1988 Order of the State Employees' Retirement Board, plaintiff may also be deprived of his vested retirement benefits to which he is entitled under the State Employees' Retirement Code ... as a result of the findings and conclusions of the defendants Board and Supreme Court in the judicial disciplinary matter.

Second Amended Complaint ¶ 17 (D.I. 16) (citation omitted).

Fed.R.Civ.P. 15(a) allows a party who has once amended his complaint as of right to amend again only when "justice so requires." Nevertheless, "the district court may properly deny leave to amend where the amendment would not withstand a motion to dismiss." *Centifanti*, 865 F.2d at 1431. In this case, the Second Amended Complaint does not cure the Amended Complaint's deficiencies because the proposed amendments do not challenge a rule of general application; rather, the amendments accentuate that Judge White's challenge is to the particular facts of his case.

For example, Judge White's Second Amended Complaint underscores that he seeks a declaration of unconstitutional conduct in order to deride the State Employes' Retirement Board's July 20, 1988 Order. Such a challenge reveals that plaintiff seeks to use the ruling from this Court in an offensive manner and as such as an injunction to impliedly or directly overrule the Pennsylvania Supreme Court's decision in this case.[9] Accordingly, the Court concludes that Judge White's motion for leave to file a Second Amended Complaint must be denied because the proposed complaint would not withstand a motion to dismiss.

## III. CONCLUSION

For the reasons stated above, the Court concludes that Judge White's motion to file an Amended Complaint will be granted,

Judge White's motion to file a Second Amended Complaint will be denied and defendants' motion to dismiss this case for lack of subject matter jurisdiction will be granted.

An appropriate Order will be entered.

---

9. As noted in footnote 7, Judge White's challenge to an ongoing state proceeding is arguably in violation of the abstention doctrine as stated in *Younger*. A proper mode of attack on the July 20, 1988 Order rests not in this Court but rather through an appeal of the Order at the state level. Judge White seems to have realized this as an appeal of the Order recently resulted in the Order being vacated and the case remanded. *White v. State Employes' Retirement System*, 129 Pa.Cmwlth. 335, 565 A.2d 839, 842–43 (1989).